IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03362-LTB

STEPHAN MOORER,

      Applicant,

v.

ISAAC FULWOOD, JR., and
WARDEN OLIVER,

      Respondents.

_____

## ORDER DENYING WRIT OF HABEAS CORPUS

_____

This matter is before the Court on the Application for a Writ of Habeas Corpus
Pursuant to 28 U.S.C. § 2241 (ECF No. 1) and the supplemental claims (ECF No. 15)
(together the "Amended Application") filed *pro se* by Applicant Stephan Moorer, an
inmate at the United States Penitentiary, Florence ADX, in Florence, Colorado.
Applicant's claims challenge the denial of his parole in 2014 and 2015.  Respondents
filed a Response (ECF No. 12) and Supplemental Response (ECF No. 23) (together
"the Answer").  Applicant also filed a "Declaration in Response to Doc. 23" (ECF No. 24)
("the Reply").

Because Applicant is proceeding *pro se*, the Court must construe his pleadings
liberally.  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam).  The Court,
however, cannot act as advocate for a *pro se* litigant.  *Hall v. Bellmon*, 935 F.2d 1106,
1110 (10th Cir. 1991).  The Court has determined that it can resolve the Amended
Application without a hearing.  28 U.S.C. § 2243; *see also Jeter v. Keohane,* 739 F.2d

257 n.1 (7th Cir. 1984) ("An evidentiary hearing is not necessary when the facts essential to consideration of the constitutional issue are already before the court."). Upon careful review of the materials supplied by the parties, the Court finds that the Amended Application should be DENIED and the case DISMISSED for the reasons discussed below.

## I. Background

Applicant is serving a thirty-year sentence in prison pursuant to a conviction in the Superior Court of the District of Columbia for carrying a pistol without a license and unarmed manslaughter that was committed on September 10, 1997. (ECF No. 12-1 at 2). Although Applicant was sentenced by a D.C. court under the D.C. Code, he was transferred to the custody of the United States Bureau of Prisons ("the BOP") to serve his sentence pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997 ("the Revitalization Act"), Pub. L. No. 105-33, § 11231(a)(1), 111 Stat. 712, 745, D.C. Code § 24-131(a). The Revitalization Act also transferred paroling authority from the D.C. Board of Parole to the United States Parole Commission ("the Commission"). *Id.,* § 11231©. Applicant is projected to be released on June 1, 2029 via mandatory parole. (ECF No. 12-1 at 2).

In the initial Application filed December 11, 2014, Applicant asserts five claims for relief challenging the Commission's denial of parole based on the April 2, 2014 parole reconsideration hearing and the May 2, 2014 Notice of Action, which was corrected by the December 23, 2014 Notice of Action. Applicant specifically claims that:

- the Commission incorrectly applied parole guidelines concerning his "negative institutional misconduct" (claim one);

2

- the Commission failed to specify what unusual circumstances warranted a departure from parole guidelines (claim two);

- the Commission incorrectly applied parole guidelines concerning his positive program achievement (claim three); and

- the Commission failed to mention two disputed incident reports for criminal mail abuse (IR 2267819 and IR 2307191) (claims four and five).

(*See* ECF No. 1 at 2-9).

On April 9, 2015, Applicant filed a "Motion to Supplement Initial Application" (ECF No. 15). The Court granted Applicant's request to supplement the initial application and deemed the Application to be amended, such that it now includes the following claims:

- the Court should substitute the Parole Commission as respondent instead of Isaac Fulwood, Jr. (claim six);

- the hearing examiner wrongfully recommended denial of parole at Applicant's March 31, 2015 parole reconsideration hearing based on two incident reports that "(1) were disposed of after consideration at previous parole reconsideration hearings; (2) occurred 36 months ago, and (3) are illegally determined to be criminal conduct" (claim seven);

- Applicant's warden wrongfully denied him access to a notary public for his March 31, 2015 parole reconsideration hearing (claim eight); and

- the Commission destroyed the audio recording of Applicant's April 2, 2014 parole reconsideration hearing (claim nine).

(ECF No. 15 at 2-8).

As relief, Applicant seeks expungement of the incident reports for criminal mail abuse (IR 2267819 and IR 2307191), "production of the April, 2014 parole reconsideration hearing, and production of the March 31, 2015 parole reconsideration hearing," and his immediate release on parole. (*See* ECF No. 1 at 11; ECF No. 15 at 8).

## II. Standard of Review

A habeas proceeding under 28 U.S.C. § 2241 is "an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811 (10th Cir. 1997) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)).  On a habeas application challenging the denial of parole by the Commission, review of the Commission's decision is narrow.  *See Peltier v. Booker,* 348 F.3d 888, 892 (10th Cir. 2003).  The appropriate standard of review "is whether the decision is arbitrary and capricious action or is an abuse of discretion." *Dye v. U.S. Parole Comm'n*, 558 F.2d 1376, 1378 (10th Cir. 1977) (per curiam); *see also Gometz v. U.S. Parole Comm'n,* 294 F.3d 1256, 1260 (10th Cir. 2002) ("We will not disturb a decision by the Parole Commission 'unless there is a clear showing of arbitrary and capricious action or an abuse of discretion.'") (internal citation omitted).  "The inquiry is not whether the Commission's decision is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons." *Gometz,* 294 F.3d at 1260 (internal quotation marks omitted).  The Court does "not reweigh evidence, make credibility determinations, or substitute [its] judgment for the Commission's.*" Id.* Moreover, "it is not the function of courts to review the Board's discretion in denying parole or to repass on the credibility of reports received by the Board in making its determination." *Dye,* 558 F.2d at 1378.

## III.  Relevant Statutory Background

At the time of Applicant's offenses in 1997, parole determinations for D.C. Code offenders, like Applicant, were made by the D.C. Board of Parole pursuant to

regulations published in 1987.  (*See* ECF No. 12-12, D.C. Mun. Regs. tit. 28, §§ 100 *et.*
*seq.* (1987) (repealed Aug. 5, 2000)) (hereinafter "the 1987 Guidelines").  The 1987
Guidelines utilized a series of "pre and post-incarceration factors which enable[d] the
Board to exercise its discretion" to determine whether parole candidates were suitable
for parole.  (*Id.* at 15-20, the 1987 Guidelines §§ 204.1 - 204.22).  Specifically, after
consideration of six pre-incarceration factors, the D.C. Board of Parole calculated a
parole candidate's baseline number of points "(base point score") that provided 0 for low
risk, 1 for fair risk, 2 for moderate risk, and 3 for high risk.  (*Id.* at 18, the 1987
Guidelines § 204.17); *see also Sellmon v. Reilly,* 551 F. Supp.2d 66, 70 (D.D.C. 2008)
(describing in detail how the 1987 Guidelines operate).

     The D.C. Board of Parole then adjusted the base point score into the total point
score or point assignment grid score (hereinafter the "grid score") after consideration of
one additional pre-incarceration factor (adding one point if the parole candidate's
offense involved violence, weapons, or drug trafficking), and two post-incarceration
factors (adding one point for negative institutional behavior and subtracting one point for
program achievement).  (*See* ECF No. 12-12 at 18-19, the 1987 Guidelines § 204.18);
*see also Sellmon,* 551 F. Supp.2d at 70-71.  The 1987 Guidelines indicated that parole
should be granted (with varying levels of supervision) in parole reconsideration
proceedings if the grid score was between 0 and 3, or denied if the grid score was
between 4 and 5.  (*Id.* at 20, the 1987 Guidelines *§* 204.21).  The 1987 Guidelines,
however, provided the D.C. Board of Parole with discretion to deny parole to prisoners
deemed suitable by the grid score where the parole candidate was "a greater risk for
parole than reflected by his or her total point score," and the Board specified in writing

5

what applicable factors it followed in deciding that a departure from the guidelines was warranted.  (*Id.*, the 1987 Guidelines § 204.22); *see also Sellmon,* 551 F. Supp.2d at 71 (recognizing that the Parole Board could depart from the action indicated by the guidelines by referencing an applicable aggravating or mitigating factor); *Ellis v. Dist. of Columbia,* 84 F.3d 1413, 1415 (D.C. Cir. 1996) ("[Under the statutory law of parole in D.C.,] even if a prisoner established everything the statute required, the Board of Parole still had discretion to deny parole.").

The D.C. Board of Parole clarified and expanded the 1987 Guidelines through policy statements in 1991, 1992, and 1995.  (*See e.g.,* ECF No. 12-13, 1991 Policy Guideline; ECF No. 12-14, 1995 Policy Guideline).  The 1991 Policy Guideline defined terms appearing in the 1987 Guidelines.  For example, in order to add a point for "negative institutional behavior" in parole reconsideration proceedings, the prisoner had to acquire either "(1) One Class I Offense. . .; OR (2) Two Class II Offenses" after "the preceding release consideration on the sentence."  (ECF No. 12-13 at 2); *see also Sellmon,* 551 F. Supp.2d at 71.  Moreover, the 1991 Policy Guideline "added and defined three additional 'unusual circumstances' that would justify a departure from the action indicated by the [grid score]," including "repeated or extremely serious negative institutional behavior."  (ECF No. 12-13 at 7-8); *Sellmon,* 551 F. Supp.2d at 72.

The 1995 Policy Guideline, which superseded the 1991 Policy Guideline, revised the factors that would support a departure from the action recommended by the grid score.  (*See* ECF No. 12-14).  For example, the 1995 Policy Guideline spoke only of "serious negative institutional behavior" as a factor that would support a departure and defined the term as "documented criminal conduct or breach of institutional rules, the

6

severity, frequency, or recent occurrence of which indicates that subject is not ready to remain crime-free in the community." (*Id.* at 3). Moreover, "[u]nlike the 1991 Policy [Guideline], which provided a three-year limitation period, the 1995 Policy [Guideline] allowed for the consideration of infractions that had occurred at any time during incarceration." *Goodall v. Billingsley,* No. 11Civ.5603(RA), 2013 WL 3343658, at *5-7 (S.D.N.Y. June 28, 2013) (unpublished).

On August 5, 1997, the Revitalization Act abolished the D.C. Board of Parole and tasked the Commission with responsibility for making parole determinations "pursuant to the parole laws and regulations of the District of Columbia." *See* Pub. L. No. 105-33, § 11231, 111 Stat. 712, 734-37 (codified at D.C. Code §§ 24-101 *et seq.* (2001 & Supp. 2005). Between 1998 and 2000, the Commission drafted new parole regulations and guidelines (hereinafter "the Commission Guidelines") that it applied to any D.C. Code offender who received an initial parole hearing after August 5, 1998. *See* 28 C.F.R. § 2.20; *see also Sellmon,* 551 F. Supp.2d at 72. However, due to subsequent litigation raising *ex post facto* concerns, the Commission promulgated a rule in 2009 that application of the 1987 Guidelines applied to any offender who committed his crime between March 4, 1985 (the effective date of the 1987 Guidelines), and August 4, 1998 (the last day the D.C. Board of Parole exercised parole release authority) (hereinafter "the *Sellmon* Rule"). *See* 74 Fed. Reg. 34688 (July 17, 2009) (interim rule, effective August 17, 2009) and 28 C.F.R. § 2.80(o) (November 13, 2009) (final rule).

## IV. Applicant's Parole Hearing History

On February 20, 2007, the Commission conducted Applicant's initial parole hearing under the Commission Guidelines. (*See* ECF No. 12-2). The hearing examiner

7

recommended denial of parole and reconsideration in three years.  (*Id.* at 5).  The hearing examiner noted that Applicant's "behavior in prison has been marked by a number of disciplinary actions for Fighting and Possession of Weapons and Assault." (*Id.* at 4).

On March 5, 2007, the Commission issued its Notice of Action denying parole and continuing the matter to a reconsideration hearing in February 2010.  (*See* ECF No. 12-3).  Under the Commission Guidelines, the Commission determined that Applicant's total guideline range (the total range of time the prisoner must presumptively serve before he is suitable for parole) was 149 to 197 months, which included consideration of twelve disciplinary infractions, three of which counted as new criminal conduct that were committed while Applicant was incarcerated.  (*Id.* at 1, 3).

Applicant next appeared at his second parole hearing on January 5, 2010.  (ECF No. 12-4).  Following the *Sellmon* Rule, the hearing examiner reevaluated Applicant's case pursuant to the 1987 Guidelines and determined that his base point score was 2, which included adding one point for negative institutional behavior based on the twelve disciplinary infractions that Applicant had incurred prior to his initial parole hearing in 2007.  (*Id.* at 2).  The hearing examiner further determined that Applicant's current grid score was 2, which included adding one point for negative institutional behavior based on six additional disciplinary infractions acquired after Applicant's initial parole hearing, and subtracting one point for positive program achievement.  (*Id.* at 2-3).  The hearing examiner specifically found that Applicant received two "Class One" disciplinary offenses for assault with serious injury and possession of a weapon.  (*Id.*).  The hearing examiner further noted that although Applicant "has a parolable Grid Score of 2 . . . due

8

to his ongoing serious and negative institutional behavior, this examiner does not believe [Applicant] has shown that he is worthy of a parole date at this point." (*Id.* at 3).

The Commission applied the 1987 Guidelines and followed the hearing examiner's recommendations in its February 24, 2010 Notice of Action. (*See* ECF No. 12-5).  The Commission explained that while Applicant's grid score of 2 indicated that parole should be granted, a departure above the guidelines was warranted because "the Commission finds there is a reasonable probability you would not obey the law if released and your release would endanger the public safety." (*Id.* at 1).  The Commission specifically noted that Applicant "continued to engage in serious negative institutional behavior" and determined that Applicant's disciplinary record consisted of the following: (I) eleven disciplinary infractions prior to Applicant's initial parole hearing in 2007; (ii) five disciplinary infractions since the initial hearing; and (iii) three acts of possession of a dangerous weapon and two assaults with serious injury. (*Id.*).  The Commission advised Applicant that he "must demonstrate a substantial period of incident free conduct prior to further parole consideration." (*Id.*).  A reconsideration hearing was scheduled in 24 months. (*Id.*).

On February 1, 2012, the Commission conducted Applicant's third parole hearing. (*See* ECF No. 12-7).  The hearing examiner listed three incidents of institutional misconduct committed by Applicant since the January 2010 parole hearing, which included a "Class 2" infraction for fighting in March 2010, a "Class 1" infraction for using marijuana in November 2010, and a "Class 2" infraction for phone abuse in October 2011. (*Id.* at 2-3).  The hearing examiner added one point for negative institutional behavior based on these infractions. (*Id.*).  Although Applicant's grid score

9

remained 2, which indicated parole under the 1987 Guidelines, the hearing examiner

recommended denial of parole as well as reconsideration in 24 months because "[y]ou

are a more serious risk than shown by your point score because you have engaged in

serious negative institutional behavior." (*Id.* at 3).

On March 12, 2012, the Commission issued its Notice of Action denying parole

and continuing the matter for a reconsideration hearing in February 2014.  (ECF No. 12-

8).  The Commission explained that while the 1987 Guidelines indicated that Applicant

should be granted parole, a departure was warranted because of his serious negative

institutional behavior, which indicated that Applicant was "not ready to obey the laws if

paroled." (*Id.* at 1).  The Commission also determined that a departure from the

guidelines for a rehearing within one year was warranted because "it believes the

additional time in custody is necessary for you to prove to the Parole Commission that

you can go an extended period of time in custody without violating the rules of the

institution." (*Id.*).

Applicant next appeared at his fourth parole hearing on April 2, 2014.  In the

hearing summary, the examiner noted three new disciplinary infractions since

Applicant's 2012 rehearing, including one BOP incident report for fighting and two BOP

incident reports for Mail Abuse Criminal (IR 2307191 and IR 2267819).  (*See* ECF No.

12-9 at 2).  At the hearing, Applicant admitted to the infraction for fighting but denied the

criminal mail abuse charges.  (*Id.*)  The hearing examiner found that Applicant violated

the rules of the institution in all three instances based on the BOP disciplinary hearing

officers' findings, and added one point for negative institutional behavior to Applicant's

grid score. (*Id.* at 2-3).  After recognizing that Applicant had a grid score of 2, which

indicated that parole should be granted, the hearing examiner recommended that the

Commission deny parole and that Applicant receive a rehearing in 12 months. (*Id.* at 3).

The hearing examiner provided the following written statement of the reasons for her

recommendations:

> To his credit, since he last appeared before the Commission he has
> completed an Anger Management Workbook sponsored by the
> Psychology Department and a 6 credit Essay on the Power of Intention.
> He was commended by the state psychologist for demonstrating both
> insight into his behavior and recognizing the consequences of his actions.
> He is currently enrolled in the Substance Abuse Program. Although he has
> exhibited some improvement, he has incurred three disciplinary
> infractions, the most serious infraction was again for Fighting. His
> continued inability to resolve conflicts without violence, suggests that he is
> not currently suitable for release on parole.
>
> The guidelines suggest that with a Grid Score of 2 that the parolee be
> granted parole. Based upon his continued inability to resolve conflicts
> without violence, this hearing examiner finds that he is a more serious risk
> than what the guidelines suggest.

(*Id.* at 3).

On May 1, 2014, the Commission issued its Notice of Action denying parole and

continuing the matter for reconsideration in April 2015. (ECF No. 12-10).  In the Notice

of Action, the Commission stated that under the 1987 Guidelines, one point should be

added for negative institutional behavior since Applicant's last parole rehearing, and that

his "current Grid Score is 3." (*Id.* at 1).  The Commission provided the following reasons

for denying parole:

> [A] departure from the guidelines at this consideration is found warranted
> because the Commission finds there is a reasonable probability that you
> would not obey the law if released and your release would endanger the
> public safety.  You are a more serious parole risk than shown by your grid
> score because your continuance to engage in violent conduct (fighting)
> during your confinement makes you a more serious risk than what the
> guidelines suggests.

(*Id.*).

A corrected Notice of Action was issued by the Commission on December 23, 2014 to reflect that Applicant had been awarded an one point reduction for program achievement at his April 2014 parole rehearing, and that Applicant's current grid score was therefore 2 instead of 3.  (*See* ECF No. 12-11).  The Commission's decision to deny parole and its explanation for departing from the guidelines remained the same. (*Id.*).

On March 31, 2015, a hearing examiner conducted Applicant's fifth parole hearing.  In the post hearing assessment, the hearing examiner did not add any points for negative institutional behavior because Applicant "incurred no new disciplinary infractions since his last hearing."  (ECF No. 23-1 at 2).  The hearing examiner, however, found that Applicant

> is still a more serious risk than indicated by his grid score of 1 on the basis of serious negative institutional behavior due in part to the disciplinary infractions committed in 2010, 2011, and 2012.  Specifically, this examiner obtained new information from the BOP regarding prior infractions for mail abuse and finds the conduct may have involved more serious conduct than the Commission considered at the previous hearing.

(*Id.*).

The hearing examiner then summarized Applicant's disciplinary history, from 2001 to 2012, including five disciplinary infractions for fighting, five disciplinary infractions for assault with serious injury, three disciplinary infractions for possession of dangerous weapons, one disciplinary infraction for drug use (marijuana), two disciplinary infractions for stealing, and multiple counts of phone and mail abuse.  (ECF No. 23-1 at 3).  The hearing examiner explained that "[t]he above infractions were

considered at previous hearings and resulted in the Commission's findings he was a

more serious risk" in deciding to deny parole in 2007, 2010, 2012, and 2014.  (*Id.*).

The hearing examiner continued by detailing the "new information" he received

from the BOP in the "Notice of Hearing on Referral for Transfer to ADX Florence

General Population" and the "ADX General Population Hearing Administrator's Report"

(hereinafter "the ADX Reports").  (*See* ECF No. 23-1 at 3).  The hearing examiner noted

that the ADX Reports provided details concerning the two BOP incident reports for Mail

Abuse Criminal (IR 2307191 and IR 2267819).  (*Id.* at 3-5).  The hearing examiner

stated the following:

> Before discussing the details of the new information, it should be noted,
> for context, the subject's history of phone and mail abuse resulted in his
> movement to the Communications Management Unit (CMU) at Terre
> Haute. The last instance of mail abuse occurred while the subject was in
> the CMU and, this along with an incident of fighting (addressed on the
> Commission's last NOA dated 12/23/2014), were essentially the proverbial
> "last straws" resulting in his referral to the ADX.
>
>  . . . .
>
> While the infraction of mail abuse is typically a relatively minor offense,
> this examiner finds the above two incidents of mail abuse involve
> preparation of fraudulent checks. The first incident involves a
> homemade/fraudulent check in the amount of $99,999,999, and this
> examiner finds the amount on the check to be almost farcical, to the extent
> it would almost be unreasonable to think anyone would actually believe
> the amount on the check is real. Nonetheless, fraudulent preparation of
> such a check is a violation of the law. This examiner is much more
> concerned regarding the second, and most recent incident of mail abuse,
> which involved the subject mailing a fraudulent check in the amount of
> $9,500, with instructions for another individual in the community
> to open a bank account. This examiner views these incidents as new
> criminal conduct in a prison facility that extends into the community and
> finds the conduct committed far more serious than what the caption of the
> offense would otherwise suggest.  The fact that he sent these two
> fraudulent checks out while housed in a CMU due to other similar issues
> of phone and mail abuse, and tried to disguise the correspondence as

13

"legal mail" is considered an aggravating factor.

Again, though the above mail abuse infractions were considered at the last hearing, it does not appear the Commission was aware of the extent and severity of the conduct. For this reason, this examiner believes there is a strong possibility the Commission may have considered a longer setoff following the previous hearing.  In considering the totality of the subject's disciplinary infractions, including the new information, this examiner finds the subject is still a more serious risk on the basis of serious negative institutional behavior and finds the severity, frequency, and (relatively) recent occurrence of which indicates he is not ready to remain crime-free in the community.

(*Id.*).

Accordingly, the hearing examiner recommended that the Commission deny

parole despite Applicant's grid score of 1.  (*Id.* at 5-6).  The hearing examiner also

recommended that the Commission depart from the rehearing guidelines and set a

rehearing in 24 months.  (*Id.*).  Finally, the hearing examiner added the following

information:

The subject presented as very argumentative during his hearing.  He was highly critical of past Commission findings and frequently referenced prior litigation in this case.  He also seemed confused about the guideline application in his case as he routinely referenced procedures under the Commission's 2000 guidelines and the DC Board's 1991 policy guideline, neither one of which are applicable in his case.  Further he demanded this examiner explain to him how the 1995 policy guideline would be applied in his case and whether the 1995 policy guideline replaced the 1987 DC Board guidelines.  In response, this examiner explained we are continuing to apply the 1987 DC Board guidelines.  I also advised the 1995 policy guideline, which is applicable in his case, does not replace the 1987 guidelines, but rather served as a mechanism to further clarify how the Board was to apply the 1987 guidelines, particularly as it pertained to identifying/clarifying factors both favoring release and favoring further incarceration.

The subject also expressed a great deal of confusion and frustration that this examiner was still considering disciplinary infractions that were considered at his last hearing. . . This examiner tried to explain this was a reconsideration hearing and, as a result, the Commission may consider

14

any relevant information in determining suitability for parole.  Further, this examiner tried to explain the Commission is not adding a point for negative behavior (since he has none since his last hearing), but that doesn't mean the Commission can no longer consider past disciplinary conduct as it pertains to his overall risk.  This examiner was never able to fully state any of this because the subject continually interrupted this examiner before I could make a full statement.  The subject was extremely uncooperative with this examiner during his hearing, hearing only what he wanted to hear.  He was fixated during the hearing that the Commission could not consider any infraction that occurred more than 3 years ago, despite this examiner explaining numerous times the 1991 policy guideline was not applicable.  He provided a letter documenting many of these incorrect assumptions.  He got up to leave the hearing room before this examiner could even pronounce the whole recommendation or explain my reasoning.  He came back only to launch a barrage of questions and accusations toward this examiner, but never allowed me the opportunity to respond.  He then left the room, making threats of additional litigation.  This examiner did take the time to explain my reasons to the subject's case manager after he left, so he may be able to relay those reasons later, after the subject has calmed down.

This examiner finds the subject's attitude and uncooperative nature during his hearing is additional evidence he is not ready to be paroled.

On a favorable note, there is evidence the subject is a good programmer.  He provided documentation that he completed a paralegal certification program, Commercial Driver's License programming, and the 40-hour drug program.  Despite his favorable achievements, this examiner finds the factors favoring additional incarceration weigh heavier in this case.

(ECF No. 23-1 at 6-7).

On April 20, 2015, the Commission issued its Notice of Action denying parole

and continuing the matter for a reconsideration hearing in March 2017.  (ECF No. 23-2).

The Commission determined that under the 1987 Guidelines, one point should be

deducted for program achievement and that Applicant's current grid score is 1, which

indicates that parole should be granted.  (*Id.* at 1). The Commission provided the

following reasons for its decision to depart from the guidelines and deny parole:

After consideration of all factors and information presented, a departure

15

from the guidelines at this consideration is warranted because the Commission finds there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety.  You are a more serious risk than shown by your grid score because of your serious negative institutional behavior.  Though you have not committed any new disciplinary infractions in the year since your last hearing, the Commission continues to find your cumulative disciplinary record, including the most recent infractions of mail abuse, which the Commission views as new criminal conduct extending into the community, and the severity, frequency, and recent occurrence of which, all indicate you are not ready to remain crime-free in the community.

(ECF No. 23-2).

The Commission also departed from the guideline's recommendation that Applicant receive a rehearing in 12 months, instead postponing Applicant's next parole hearing for 24 months.  (*Id.*).

## V.  Analysis of Claims

### A.  Claim Six

The Court first will address Applicant's contention in Claim Six that the Court should substitute the Commission as respondent instead of Isaac Fulwood, Jr., Chairmen of the U.S. Parole Commission.  A § 2241 application is properly addressed to the person with "custody over" the applicant.  *See* 28 U.S.C. § 2242.  Thus, the United States Supreme Court has recognized that with certain narrowly-defined exceptions, none applicable here, "the proper respondent [in a habeas corpus case] is the warden of the facility where the prisoner is being held."  *Rumsfeld v. Padilla,* 542 U.S. 426, 435 (2004).  The Tenth Circuit has declined to decide whether a habeas challenge to a decision by the U.S. Parole Commission renders the Commission the de facto "custodian" and thus, the proper respondent, where the government already filed a

brief on the merits.  *See Von Kahl v. United States,* 321 Fed. App'x 724, 727 n.1 (10th

Cir. 2009) ("Whoever the proper respondent may be, the government has filed a brief on

his or its behalf.  We therefore proceed to the merits."); *see also DeWilliams v. Davis,*

369 Fed. App'x 912, 915 (10th Cir. 2010) (denying motion to add the United States

Parole Commission Chairman as respondent to appeal because the "only proper

respondent in this case is [ ] the warden . . .  where [Applicant] is being held").  Here,

Applicant has named his warden as a respondent and the government has filed its

Answer.  Accordingly, this Court declines to resolve Claim Six, and proceeds to the

merits of Applicant's remaining habeas corpus claims.

### B.  Claim One

Applicant first claims that the Commission "erroneously applied" the 1987

Guidelines at his 2014 parole reconsideration proceedings.  Specifically, he asserts that

the 1987 Guidelines define "negative institutional behavior" as "one Class One offense

or two Class Two Offenses occurring since the preceding release consideration on the

sentence," and that "the Notice of Action dated May 1, 2014 cites only one Class Two

offense," which is "not contemplated to be negative institutional behavior" under the

1987 Guidelines.  (ECF No. 1 at 2-3).

Respondents argue that Claim One fails because the 1987 Guidelines, as

clarified by the 1995 Policy Guideline, do not contain any classification or numerical

requirements for the type or number of misconduct offenses necessary to constitute

"negative institutional behavior."  (*See* ECF No. 12 at 8-9).  Respondents further

contend that even if the 1987 Guidelines had the classification and numerical

requirements Applicant alleges, he incurred a disciplinary infraction for fighting and two

17

disciplinary infractions for criminal mail abuse, thus satisfying the requirement for "two Class II Offenses." (*Id.*).  The Court agrees with Respondents.

First, as noted above, at the April 2, 2014 parole reconsideration hearing, the examiner found that Applicant acquired an incident report for fighting and two incident reports for mail abuse since his February 1, 2012 parole reconsideration hearing. (*See* ECF No. 12-9 at 2).  Based on the hearing examiner's findings that Applicant "violated the rules of the institution" in all three instances, one point was added to Applicant's grid score for negative institutional behavior. (*Id.*).  In the May 1, 2014 Notice of Action, the Commission also explained that a departure from the guidelines was warranted because "[y]ou are a more serious parole risk than shown by your grid score because your continuance to engage in violent conduct (fighting) during your confinement makes you a more serious risk than what the guidelines suggests." (ECF No. 12-10).

The Court finds that Applicant's first claim lacks merit because the Commission correctly applied the 1987 Guidelines in adding one point for negative institutional behavior and appropriately considered Applicant's institutional misconduct as an aggravating factor to deny him parole.  First, it is undisputed that the 1987 Guidelines were applicable to Applicant's 2014 parole proceedings because he committed his crimes in 1997.  *See* 28 C.F.R. § 2.80(o) (requiring that the 1987 Guidelines apply to any offender who committed his crime between March 4, 1985 and August 4, 1998).  Moreover, the 1987 Guidelines, as clarified by the applicable 1995 Policy Guideline, do not appear to limit "negative institutional behavior" to a certain type or number of misconduct offenses as Applicant suggests.  While the 1991 Policy Guideline defined "negative institutional behavior" in reconsideration proceedings as being "One Class I

18

Offense" or "Two Class II Offenses," the 1995 Policy Guideline, which superseded the 1991 Policy Guideline, does not include any classification or counting of disciplinary infractions.  (*Cf.* ECF No. 12-13 at 2 *with* ECF No. 12-14 at 3).  Rather, the 1995 Policy Guideline speaks only of "serious negative institutional behavior," which is defined as "documented criminal conduct or breach of institutional rules, the severity, frequency, or recent occurrence of which indicates that the subject is not ready to remain crime-free in the community." (*See* ECF No. 12-14 at 3).  Thus, the Court cannot find that the Commission exceeded its authority by adding one point for negative institutional behavior to Applicant's grid score based on the three disciplinary infractions he incurred since his last parole hearing in February 2012, and in considering Applicant's serious negative institutional behavior or "documented criminal conduct or breach of institutional rules" as a factor favoring incarceration despite a grid score indicating that parole should be granted.

Moreover, Applicant's assertions do not demonstrate that the Commission's 2014 parole decision was arbitrary, capricious, or an abuse of discretion.  As discussed above, the Commission correctly added one point for negative institutional misconduct as a result of Applicant's disciplinary infractions for fighting and criminal mail abuse. Moreover, the Court finds that the Commission's decision to depart from the action indicated by Applicant's grid score rested on consideration of the permissible factor that Applicant continued "to engage in violent conduct (fighting)" which indicates that Applicant "would not obey the law if released" and that his "release would endanger the public safety." (ECF No. 12-10 at 1).  *See White v. Hyman,* 647 A.2d 1175, 1179 (D.C. 1994) (recognizing that D.C. Code § 24-404(a) is phrased in discretionary terms and

leaves it to the parole board to determine whether the prisoner is likely to be a responsible citizen if he is returned to the community and whether release on parole is consistent with public safety); *Duckett v. U.S. Parole Comm'n,* 795 F. Supp. 133, 137-38 (M.D. Pa. 1992) (upholding the Commission's departure from guidelines based upon prisoner's prior record and misconduct, which supported the finding that the prisoner posed a serious risk to public safety); *Hanna v. Bureau of Prisons,* No. 04CV585, 2005 WL 1162519, at *3 (E.D. Va. Apr. 2, 2005) (unpublished) (holding that a prisoner's "risk to the community is a relevant factor to be considered at each parole hearing"); *DeVaughn v. Driver,* Civil Action No. 06CV80, 2008 WL 4686162, at * 7 (N.D. W.Va. Oct. 7, 2008) (unpublished) (recognizing that a prisoner's institutional record "is relevant to determining whether he or she will be able to live in the community without committing additional crimes and whether his or her release will be compatible with the welfare of society."). Accordingly, claim one lacks merit.

### C.  Claim Two

Applicant contends that the Commission violated 28 C.F.R. § 2.80(n)(1) by failing to specify what unusual circumstances warranted a departure from parole guidelines in the 2014 Notice of Action. (ECF No. 1 at 3). Respondents contend that the Commission adequately specified the unusual circumstances in the Notice of Action. (ECF No. 12 at 9).

A review of the record indicates that in the May 1, 2014 Notice of Action (and the corrected December 23, 2014 Notice of Action), the Commission acknowledged that:

> [t]he guidelines indicate that parole should be granted at this time. However, a departure from the guidelines at this consideration is warranted because the Commission finds there is a reasonable probability

20

that you would not obey the law if released and your release would endanger the public safety.  You are a more serious parole risk than shown by your grid score because your continuance to engage in violent conduct (fighting) during your confinement makes you a more serious risk than what the guidelines suggests.

(ECF Nos. 12-10 and 12-11).

It is undisputed that the Commission may deviate from the parole determination suggested by the grid score "in unusual circumstances," where the Commission specifies "in writing those factors which it used to depart."  (ECF No. 12-12 at 20, the 1987 Guidelines § 204.22); *see also* 28 C.F.R. § 2.80(n)(1) (the Parole Commission "shall specify in the notice of action the specific factors that it relied on in departing from the applicable guideline or guideline range.").

In this case, the Commission complied with the 1987 Guidelines when it stated that a departure was warranted based on Applicant's "continuance to engage in violent conduct (fighting)" during his confinement and the reasonable probability that Applicant's "release would endanger the public."  *See Hanna,* 2005 WL 1162519, at *3 (holding a prisoner's "risk to the community is a relevant factor to be considered at each parole hearing"); *Duckett,* 795 F. Supp. at 137-38 (upholding the Commission's departure from the guidelines based upon the prisoner's prior record and misconduct, which supported the finding that the prisoner posed a serious risk to public safety). Moreover, the Constitution requires nothing more when parole is denied than that the inmate be informed "in what respects he falls short of qualifying for parole." *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 16 (1978).  The Commission's statement of reasons given to Applicant in its 2014 Notice of Action satisfies both these standards. Accordingly, Applicant's claim related to the sufficiency of the Commission's explanation

for its departure from the guidelines in the 2014 Notice of Action must fail.

### D. Claim Three

Applicant asserts that the Commission incorrectly applied parole guidelines in violation of 28 C.F.R. § 2.80(e) by not subtracting a point for program achievement and failing to "cite[], mention[], or reference[]" Applicant's positive conduct in the 2014 Notice of Action.  (ECF No. 1 at 5).   Respondents argue that this claim fails because the Commission correctly subtracted a point for Applicant's program achievement, which was reflected in the corrected December 23, 2014 Notice of Action.  (ECF No. 12 at 10).

As detailed above, at the April 2, 2014 parole reconsideration hearing, the hearing examiner correctly noted that Applicant was entitled to a one point deduction from his grid score for his program achievement in completing several programs.  (*See* ECF No. 12-9 at 2).  While the May 1, 2014 Notice of Action failed to mention the program achievement calculation, the corrected December 23, 2014 Notice of Action stated that Applicant's "point score has been corrected to include the 1 point reduction for program achievement that was awarded at you [sic] hearing on April 2, 2014."  (ECF No. 12-11 at 1).  Thus, Applicant's assertion is not supported by the record.

Moreover, Applicant's claim that "the omission of these achievements adversely impacted my eligibility for parole" is without merit because the Commission expressly acknowledged in the December 23, 2014 Notice of Action that Applicant's program achievement was considered in calculating his grid score, and the Commission's reason for not granting parole was related to Applicant's "continuance to engage in violent conduct" while incarcerated.  (*See* ECF No. 12-11).  Ultimately, the Court finds that any errors committed by the Commission regarding Applicant's program achievement do not

22

rise to the level of arbitrary and capricious action.

### E.  Claims Four and Five

In claims four and five, Applicant further challenges the sufficiency of the 2014

Notice of Action.  Specifically, Applicant claims that the 2014 Notice of Action wrongfully

omitted any reference to two incident reports for criminal mail abuse (IR 2267819 and

IR 2307191) that Applicant disputed at his April 2, 2014 parole reconsideration hearing.

(ECF No. 1 at 6-7).  Respondents assert that the hearing summary reflects that the

examiner relied on the outcomes of the BOP disciplinary proceedings for both incident

reports, which provides adequate grounds for the examiner's findings of negative

institutional behavior.  (ECF No. 12 at 10-12).

The BOP inmate disciplinary procedures are specifically tailored and designed to

meet the due process safeguards outlined by the Supreme Court in *Wolff v. McDonnell,*

418 U.S. 539 (1974).  *See* 28 C.F.R. § 541, *et seq.*  Thus, the Commission may rely on

BOP incident reports and the outcome of BOP disciplinary hearing proceedings as

evidence of institutional misconduct.  *See Hunter v. U.S. Parole Comm'n,* Civil No. 10-

CV-1594, 2011 WL 4528469, at *7 (M.D. Pa. Sept. 28, 2011) (unpublished) (holding

that "[s]ince the procedures employed by BOP disciplinary proceedings fully satisfy due

process requirements, reliance on the outcomes of those proceedings is fully justified by

parole adjudicators"); *DeVaughn,* 2008 WL 4686162, at *7 ("the Commission may

consider official reports of the prisoner's prior record, reports from the staff of the facility

where the prisoner is confined, and any other relevant information concerning the

prisoner that is reasonable [sic] available."); *see also Roberts v. Corrothers,* 812 F.2d

1173, 1180-81 (9th Cir. 1987) ("Where the Commission properly has evidence before it .

. . the evaluation of that evidence is almost entirely at its discretion.").

Here, the hearing examiner considered the findings of the BOP disciplinary hearing officers for both incident reports of criminal mail abuse (IR 2307191 and IR 2267819), and permitted Applicant the opportunity to respond.  In the hearing summary, the examiner specifically noted that Applicant "emphatically" denied the mail abuse charges and offered his explanation as to why his behavior did not constitute criminal mail abuse.  (*See* ECF No. 12-9 at 2).  The hearing examiner disagreed with Applicant and found that he violated the rules of the institution based on the outcomes of the BOP disciplinary proceedings.  (*See id.*).  Applicant nevertheless asks this Court to presume that the Commission did not consider this information in reaching its decision to deny parole because the incident reports were not expressly discussed in the 2014 Notice of Action.  The Court cannot assume that the Commission ignored the evidence which Applicant presented during his parole reconsideration proceedings and which is referenced in the hearing examiner's summary.  *See e.g., Nunez-Guardado v. Hadden,* 722 F.2d 618, 621 (10th Cir. 1983)*; see also DeVaughn,* 2008 WL 4686162, at *7 (recognizing that the Commission's determination as to the credibility of the prisoner's institutional record was not subject to review except for statutory, regulatory, or constitutional violations).  Here, Applicant does not challenge the fact that he was afforded the rights provided under the BOP's regulations concerning inmate disciplinary proceedings, and that each of the due process requirements under *Wolff* was met.  Because there is no evidence in the record that the Commission exceeded its authority, claims four and five are subject to dismissal.

Moreover, even if the hearing examiner found that there was insufficient

evidence to support the criminal mail abuse charges (IR 2307191 and IR 2267819), Applicant's disciplinary infraction for fighting, to which he admitted, constituted negative institutional behavior under the 1987 Guidelines.  In fact, the Commission expressly stated that this "violent conduct (fighting)" provided the basis for Applicant's unsuitability for parole in the 2014 Notice of Action.  (*See* ECF Nos. 12-10 and 12-11) ("A departure from the guidelines at this consideration is found warranted . . . because your continuance to engage in violent conduct (fighting) during your confinement makes you a more serious risk that what the guidelines suggests."); *see also Hodges v. O'Brien,* 589 F. Supp. 1225, 1229-30 (D. Kan. 1984) (recognizing that the "Commission's stated reasons are by definition the factors which the Commission considered most significant.") (internal citation omitted).  Since this reason alone provides a rational basis for the Commission's decision to deny parole, this Court will not substitute its opinion for that of the Parole Commission.  *Gometz,* 294 F.3d at 1260

### F.  Claim Seven

Applicant maintains that at his March 31, 2015 parole reconsideration hearing, the examiner wrongfully recommended denial of parole based on the two incident reports for criminal mail abuse (IR 2267819 and IR 2307191) that "(1) were disposed of after consideration at previous parole reconsideration hearings; (2) occurred 36 months ago, and (3) are illegally determined to be criminal conduct."  (ECF No. 15 at 3).

Respondents contend that these two incident reports were not "disposed of" at previous parole proceedings, and that the hearing examiner properly considered new information about the details of these disciplinary infractions at the 2015 parole proceedings.  (ECF No. 23 at 8-11).  Respondents further argue that the Commission

25

may consider institutional misconduct that occurred more than 36 months before the parole hearing.  (*Id.* at 12-13).  Finally, Respondents contend that the Commission properly characterized the charged disciplinary violations as criminal conduct.  (*Id.* at 13-15).

First, Applicant's contention that the hearing examiner wrongfully considered disciplinary infractions that occurred more than three years prior to the 2015 parole reconsideration hearing date is misplaced.  As discussed above, the 1995 Policy Guideline allows for consideration of infractions that occurred at any time during the parole candidate's incarceration.  *See Goodall,* 2013 WL 3343658, at *7.  Moreover, in determining Applicant's grid score, the hearing examiner did not add any points for negative institutional behavior because he found that Applicant "incurred no new disciplinary infractions since his last hearing."  (*See* ECF No. 23-1 at 2).  Thus, the hearing examiner appropriately considered the two incident reports for mail abuse (IR 2267819 and IR 2307191) by excluding the infractions from Applicant's grid score because they did not occur since his last parole hearing in 2014, but including the infractions as a relevant consideration for parole recommendation.  *See e.g., Smith v. Sepanek,* Civil No. 14-55-ART, 2015 WL 5841937, at *4 (E.D. Ky. Oct. 5, 2015) (unpublished) (denying habeas claims because the parole board acted within its authority in considering prisoner's long pattern of disciplinary infractions and institutional misconduct as reasons to deny parole even though certain infractions could not be counted in prisoner's grid score).

Second, the Commission's decision to deny parole based on Applicant's institutional misconduct, including the two incident reports for mail abuse, was not

26

arbitrary or capricious.  Courts routinely recognize "the broad authority of parole officials to fully consider all relevant information when making parole determinations."  *Hunter,* 2011 WL 4528469, at *8.  Moreover, "double-counting" claims are judged by a deferential standard of review—a parole decision will be set aside on the grounds that parole officials engaged in improper double counting only when the parole consideration of certain information was arbitrary or irrational.  *See Harris v. Martin,* 792 F.2d 52, 55 (3d Cir. 1986).  *See also Kell v. U.S. Parole Comm'n,* 26 F.3d 1016, 1020 (10th Cir. 1994) (rejecting applicant's claim that Commission should not have relied on his criminal history, past drug use, or institutional incident reports to exceed guidelines for reincarceration because it had already relied on those factors to enhance his guidelines during his initial incarceration).  In other words, where the Commission has a rational basis for considering a factor in several different ways when denying parole, a "double counting" claim will fail.  *Hunter,* 2011 WL 4528469, at *8 ("it was reasonable, rational, and entirely proper for the Commission to take into account [applicant's] on-going propensity for violence when departing from the parole guidelines"); *see also Dunmore v. Francis,* No. 06CV137, 2009 WL 775466, at *3, 9 (N.D. W.Va. March 20, 2009) (unpublished) (finding that "Commission did not act arbitrarily or beyond its authorized scope, or violate the petitioner's constitutional rights by considering prior instances of the petitioner's misconduct, which had already been considered at previous hearings").

In Applicant's case, the hearing examiner found Applicant to be riskier than his grid score suggested because of his pattern of negative institutional behavior. Specifically, the hearing examiner properly relied on Applicant's cumulative prison record, evidenced by multiple disciplinary infractions since 2001, as one of several

reasons for his recommendation to deny parole.  (ECF No. 23-1 at 3, 5).  Moreover, the

hearing examiner relied upon his view that Applicant "is not ready to remain crime-free

in the community" based on "the severity, frequency and (relatively) recent occurrence"

of Applicant's serious negative institutional behavior.  (*Id.* at 5).  Thus, the Court cannot

find that the Commission acted irrationally in considering the totality of Applicant's

disciplinary record.

Moreover, Applicant errs when he suggests that the two mail abuse incident

reports (IR 2267819 and IR 2307191) were "disposed of" at his April 2014 parole

proceedings, and therefore, his 2015 parole decision was based solely on factors

previously considered by the Commission.  To the contrary, in 2014, the Commission

expressly stated that Applicant's violent conduct and the disciplinary infraction for

fighting was the most significant factor in deciding to deny Applicant parole.  (*See* ECF

No. 12-10).

Moreover, while, the hearing examiner listed the BOP incident reports for mail

abuse (IR 2267819 and IR 2307191) in the 2014 post-hearing assessment, she did not

discuss them in any detail.  (*See* ECF No. 12-9 at 2).  In contrast, the hearing examiner

at the 2015 proceedings considered newly obtained information about the mail abuse

offenses and set forth a detailed, two-page summary of the incidents.  (*See* ECF No.

23-1 at 4-5).  The hearing examiner further explained that

> the conduct committed [is] far more serious than what the caption of the
> offense would otherwise suggest . . . though the above mail abuse
> infractions were considered at the last hearing, it does not appear the
> Commission was aware of the extent and severity of the conduct.

(*Id.* at 5).  Finally, the hearing examiner recommended denial of parole based on "the

totality of the subject's disciplinary infractions, including the new information" because Applicant "is still a more serious risk on the basis of serious negative institutional behavior." (*Id.*).  In the April 20, 2015 Notice of Action, the Commission adopted the recommendation denying parole and found that Applicant's "cumulative disciplinary record, including the most recent infractions of mail abuse, which the Commission views as new criminal conduct extending into the community, and the severity, frequency, and recent occurrence of which, all indicate you are not ready to remain crime-free in the community."  (ECF No. 23-2).

The Court finds that the new information relied upon by the Commission does not demonstrate that the Commission exceeded it authority.  "As a legal matter, it was reasonable, rational and entirely proper for the Commission to take into account [Applicant's] on-going propensity for [serious misconduct] when departing from the parole guidelines."  *See Hunter,* 2011 WL 4528469, at *8; *see also Fox v. U.S. Parole Comm'n,* 517 F. Supp. 855, 859-60 (D. Kan. 1981) (holding that the Commission's consideration of relevant materials was not arbitrary or capricious or without rational basis simply because the information was not made available at an earlier time).  Since the Commission was entitled to take into account Applicant's institutional misconduct in assessing parole suitability, the Court cannot find that the Commission abused its discretion when it denied Applicant parole in 2015.  *See e.g., DeVaughn,* 2008 WL 4686162, at *7 (rejecting habeas claim that the Commission erred in considering disciplinary reports prepared by corrections officials because the Commission may consider reports from the staff of the facility where the prisoner is confined, including documentation summarizing a prisoner's disciplinary record).

Moreover, even if this Court were to find that the Commission could not utilize the disciplinary reports for mail abuse (IR 2267819 and IR 2307191) again as a reason for departing upward from the guidelines at Applicant's 2015 parole reconsideration proceedings, this finding would not demand the granting of his habeas application.  The Court finds that the Commission cited other permissible discretion-based reasons for departing from the guidelines in denying Applicant parole in the 2015 Notice of Action. Specifically, the Commission's belief that there was a reasonable probability that Applicant's release would endanger the public safety is rationally related to the Commission's discretion in determining his suitability for parole.  *See Hanna,* 2005 WL 1162519, at *3 (holding a prisoner's "risk to the community is a relevant factor to be considered at each parole hearing"); *Cambrel v. Bledsoe,* Civil No. 3:CV-08-1684, 2011 WL 3439199, at * 9 (M.D. Pa. Aug. 5, 2011) (unpublished) (holding that the parole board articulated a rational basis for departing from parole guidelines "given the nature of [Applicant's] offense and difficult, but recently improved, ability to abstain from drugs and disciplinary infractions and violent altercations").  Here, the Commission articulated a rational basis for departing from the parole guidelines in its 2015 Notice of Action. (*See* ECF No. 23-2) ("after consideration of all factors and information presented, a departure . . . is warranted because the Commission finds there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety"),

Finally, Applicant argues that the BOP incident reports at issue were "illegally determined to be criminal conduct."  He relies on *Walden v. Gallegos,* 92 F. App'x 745 (10th Cir. 2004) for the proposition that the incident reports fail to satisfy the "some

evidence" rule because the charged activity does not describe an actual criminal

violation and he was not prosecuted for this "crime."  (ECF No. 15 at 5).  First,

Applicant's BOP disciplinary proceedings reference the mailing of fraudulent financial

documents, which arguably relates to 18 U.S.C. § 1341(prohibiting mail fraud).  (*See*

ECF No. 1 at 42-43, 52-55).  Moreover, the Commission has authority to assess the

significance of an inmate's behavior.  *See e.g., McNally v. Cooksey,* 14 F.3d 604 (7th

Cir. 1993) (rejecting habeas petitioner's argument that the Commission's

characterization of prison misconduct reports as new criminal conduct was improper);

*see also* 28 C.F.R. § 2.36(a); (prison misconduct may be classified as new criminal

behavior in the community to establish a guideline range).

     Here, after considering the ADX Reports, which are permissible sources of

information for the Commission to consult when determining parole suitability, the

hearing examiner described Applicant's conduct as the mailing of fraudulent checks and

determined that it constituted criminal conduct extending into the community.  *See*

*Dunmore,* 2009 WL 775466, at *9 (explaining that the Commission is not limited to

considering only conduct which results in criminal charges, but may consider official

reports of the prisoner's prior record, reports from the staff where the prisoner is

confined, and any other relevant information concerning the prisoner that is reasonably

available).  Therefore, the Court cannot find that the Commission's decision was not

supported by a "rational basis in the record."  *Misasi v. U.S. Parole Comm'n,* 835 F.2d

754, 758 (10th Cir. 1987) (rejecting applicant's argument to adopt a sufficiency of the

evidence standard of review of factual matters).  The Court finds that the Commission

acted within its discretion when it determined that Applicant's disciplinary infractions for

criminal mail abuse (IR 2267819 and IR 2307191) constituted criminal behavior.  *See e.g., Scott v. Eiechenlaub,* No. 09-cv-204-RS-EMT, 2011 WL 834004, at *4-5 (M.D. Fla. March 4, 2011) (unpublished) (finding that the Commission's determination that acts or attempted acts of bribery constitute something more serious than administrative rule infractions was not arbitrary and capricious).

### G.  Claim Eight

Applicant contends that the warden at ADX wrongfully denied him access to a notary public for his affidavit to be submitted at his March 31, 2015 parole reconsideration hearing.  (ECF No. 15 at 6).  Respondents argue that this is not a cognizable habeas corpus claim because Applicant does not allege that the lack of notarized papers affected the length of his confinement.  (ECF No. 23 at 15-16). Respondents further assert that Applicant fails to allege any harm because the Commission accepted and considered Applicant's sworn statement in lieu of notarized documents.  (*Id.* at 16).

The Court agrees that Claim Eight fails to present any issue warranting federal habeas corpus relief because it does not challenge the fact or duration of his custody. *See e.g., McIntosh v. U.S. Parole Comm'n,* 115 F.3d 809, 812 (10th Cir. 1997).

Moreover, even if the Court found that Claim Eight sounded in habeas corpus, it must fail because the Commission received Applicant's sworn affidavit prior to the 2015 proceedings, and the hearing examiner considered the information Applicant submitted (without notarization) because he expressly found that "there is evidence the subject is a good programmer.  He provided documentation that he completed a paralegal certificate program, Commercial Driver's License programming, and the 40-hour drug

program." (*See* ECF No. 18 at 10, 62-75; ECF No. 23-1 at 7).  Accordingly, Claim Eight fails.

### H.  Claim Nine

Finally, Applicant asserts that the Commission destroyed the audio recording of the April 2, 2014 parole reconsideration hearing "to hinder and obstruct future defenses to the disputed incident reports."  (ECF No. 15 at 7-8).  Respondents argue that this claim does not sound in habeas because it does not affect the length of Applicant's sentence; that the claim is now moot; and that there is no remedy available.  (ECF No. 23 at 17).

The Court agrees with Respondents that this claim does not sound in habeas because it does not affect the length of his sentence.  *McIntosh,* 115 F.3d at 812. Moreover, there is no judicial remedy available because the 2014 parole recording was defective.  (*See* ECF No. 15 at 97).  In addition, the remedies Applicant seeks in his Amended Application (*i.e.,* expungement of the incident reports, production of the hearing recordings, and his immediate release) cannot be granted.  *See Alexander v. U.S. Parole Comm'n,* 514 F.3d 1083, 1091 (10th Cir. 2008) (finding that the district court's authority was limited to remanding to the Parole Commission).  In this case, Applicant already has received a parole reconsideration hearing in 2015 and given the Commission's decision to deny parole based on a permissible departure factor (*i.e.,* "after consideration of all factors and information presented, a departure . . . is warranted because the Commission finds there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety"), Applicant has not shown demonstrated prejudice from the defective April 2014 audio

33

recording, and therefore, he is not entitled to release or a reduction in his prison term.

*Del Raine v. Daniels,* 462 Fed. App'x 793 (10th Cir. 2012).

## VI.  CONCLUSION

Accordingly, it is

ORDERED that the Amended Application for a Writ of Habeas Corpus Pursuant

to 28 U.S.C. § 2241 (ECF Nos. 1 and 15), filed *pro se* by Applicant, Stephan Moorer, is

DENIED and this case is DISMISSED with prejudice.  It is

FURTHER ORDERED that Applicant's Motion for Evidentiary Hearing or

Summary Judgment (ECF No. 18) IS DENIED because the Court determined that it

could resolve the claims in the Amended Application without a hearing.  It is

FURTHER ORDERED that any other pending motions are denied as moot.  It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is

denied for the purpose of appeal.  The Court certifies pursuant to 28 U.S.C. §

1915(a)(3) that any appeal from this order would not be taken in good faith.  *See*

*Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he

must also pay the full $505 appellate filing fee or file a motion to proceed *in forma*

*pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in

accordance with Fed. R. App. P. 24.

Dated January 8, 2016, at Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock
Lewis T. Babcock
United States Senior District Judge